UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Norfolk Division

AMY L. PLANCH,

    Petitioner,

v.
                       CIVIL ACTION NO. 2:18cv85
                       [ORIGINAL CRIMINAL NO. 2:16cr76]

UNITED STATES OF AMERICA,

    Respondent.

## MEMORANDUM OPINION AND FINAL ORDER

This matter comes before the court on the Petitioner's "Petition and Memorandum in Support of Amy Planch's Petition to Vacate, Set Aside, or Correct Sentence under 28 U.S.C. § 2255" ("Motion"), filed pro se on February 13, 2018. ECF No. 44. The Motion was filed subject to defect, ECF No. 45, and the Petitioner cured the defect on March 9, 2018.

The Motion requests relief on two grounds. On April 4, 2018, the court ordered the United States to respond to the Petitioner's first ground in the Motion alleging lack of due process pursuant to Brady v. Maryland, 373 U.S. 83, 87 (1963). ECF No. 46. The United States responded to ground one of the Motion on May 18, 2018. ECF No. 47. The Petitioner did not reply to the Response. The Motion is now ripe for review.

# I. BACKGROUND[1]

The Border Station, Inc. ("Border Station") opened in 1998 and has had, from its inception, three shareholders: the Petitioner's father, C.H., the majority shareholder; the Petitioner's brother, R.H.; and the Petitioner. Statement of Facts ¶¶ 1-2, ECF No. 8. Both the Petitioner and R.H. are minority shareholders. Id. ¶ 2. Until approximately March 2010, the Petitioner was the Border Station's Chief Financial Officer and bookkeeper. Id. ¶ 3. In or about March 2010, the Petitioner opened the Carolina Christmas Shoppe, Inc. ("Christmas Shoppe"), where she spent the majority of her time, while still retaining her responsibilities as the Border Station's bookkeeper. Id. ¶ 4.

After opening the Christmas Shoppe, the Petitioner began wiring hundreds of thousands of dollars in funds from the Border Station's accounts to the Christmas Shoppe's account and to her personal accounts, and then often wiring small amounts back to the Border Station's accounts. Id. ¶ 8. An external accountant who was preparing the Border Station's 2010 and 2011 tax returns noticed these large wire transfers and asked the Petitioner about them. Id. ¶ 5. In response, the Petitioner told the

---

[1] Attached to this Memorandum Opinion and Final Order, as Exhibit A, is a timeline that lists the relevant events to the Motion in chronological order.

accountant that the transfers were loans, which were the product of a verbal agreement between C.H. and her. Id.

Around November 2012, C.H. requested from the Petitioner the password to access the Border Station's payroll account balances, after he was repeatedly contacted by his bank about low funds in the account and a need for deposits into it. Id. ¶ 6. The Petitioner refused to comply. Id. As a result, C.H. reviewed the Border Station's bank statements and discovered the large money transfers to the Christmas Shoppe and to the Petitioner's personal bank accounts. Id. ¶ 7.

On or about March 26, 2013, the Petitioner went to the Federal Bureau of Investigation and "attempted [to] implicate C.H. in illegal activities"; further investigation revealed these allegations to be false. Id. ¶ 9, 9 n.1. The Petitioner told the Special Agents that she had taken money from the Border Station to purchase inventory for the Christmas Shoppe with C.H.'s consent,[2] and complained that C.H. was now claiming she was not authorized to do so. Id.

In early 2013, C.H. hired a new external accounting firm to prepare the Border Station's 2012 corporate tax return. Id.

---

[2] According to the United States, the Petitioner "blew through that nearly $1 million in a relatively short time" by spending on luxury items such as vehicles, jewelry, credit card payments, and tickets to sporting events. Hr'g Tr. 18:3-8, Feb. 3, 2017, ECF No. 43; see Statement of Facts ¶ 15.

3

¶ 10. After consulting with the accountants on how to handle the unauthorized monies taken, C.H. decided to classify the monies as additional income to the Petitioner. Id. Thus, the accountants issued an IRS Form 1099-MISC to the Petitioner for income in the amount of $887,641.00. Id. ¶ 11. The Petitioner's Individual Federal Income Tax Returns never reflected this amount as income. Id. ¶¶ 16-18.

Around September 2015, the Petitioner received a target letter from the United States, prompting her to retain Franklin A. Swartz as counsel. Hr'g Tr. 10:18-11:3, Nov. 15, 2016, ECF No. 25. At this point, the Petitioner contended that the monies taken from the Border Station were not embezzled but were loans from C.H. Id. 6:9-14. According to Mr. Swartz, the Border Station's tax returns also reflected the stance that the wired monies were loans. Id. 26:6-8. In February 2016, Mr. Swartz requested Robert M. Reed, a tax attorney at the law firm of Tavss Fletcher, to prepare documents reflecting the loans. Id. 6:15-21, 32:17-38:11. On April 1, 2016, Mr. Reed prepared papers purporting to document the loans that the Petitioner claimed. Presentence Investigation Report ("PSR") ¶ 10, ECF No. 41.[3] The

---

[3] Mr. Reed provided testimony that the Border Station's tax returns, signed by C.H., documented the monies taken by the Petitioner to be loans. Hr'g Tr. 31:22-40:4, Nov. 15, 2016. However, the IRS special agent's testimony at the hearing,

papers ("loan documents") consisted of fourteen (14) promissory notes backdated to reflect effective dates between January 1, 2009, and February 18, 2015, along with four (4) Consents in Writing "that various related entities have from time to time received loans from The Border Station and will continue in the future." Id. Mr. Reed noted in the cover letter for these backdated documents, and in testimony before the court, that he prepared the documents after-the-fact in order to address loans that he believed were made to shareholders and related companies of the Border Station. Id.; Hr'g Tr. 34:15-19, 36:20-37:1, Nov. 15, 2016.

Around April 5, 2016, Mr. Swartz learned that C.H. had testified before a Grand Jury and made statements in conflict with the loan documents and what C.H. had previously told Mr. Swartz. Hr'g Tr. 18:22-19:3, Nov. 15, 2016. Based upon this information, Mr. Swartz told C.H.'s attorney, Blake Boyette: "[T]hrow [the loan documents] in the trash can because they have absolutely no validity if they are not signed and agreed to, they are not worth the paper they are written on." Id. 19:9-12. Then, on April 10, 2016, the Petitioner, under Mr. Swartz's prior advice, brought the loan documents to R.H. for his

---

discussed infra note 5 and accompanying text, contradicts this testimony and evidence.

signature. PSR ¶ 10. R.H. told the Petitioner that he would not sign them, and the Petitioner left under the impression that R.H. had not signed the documents. Id.

On May 17, 2016, a one-count Criminal Information was filed charging the Petitioner with Evasion of Income Tax Assessment, in violation of 26 U.S.C. § 7201. ECF No. 1. The Petitioner pleaded guilty to the charge on June 30, 2016. ECF Nos. 4, 7, 9. On November 15, 2016, the Petitioner appeared with Mr. Swartz for a sentencing hearing and was adjudged guilty pursuant to her guilty plea. Hr'g Tr. 3:4-13, Nov. 15, 2016. Both parties objected to the obstruction of justice enhancement under U.S.S.G. § 3C1.1, which was assigned to the Petitioner as a result of her attempt to have R.H. sign the loan documents. PSR ¶¶ 14, 21; PSR Addendum.[4] Thus, at the initial sentencing hearing, Mr. Swartz proffered, and Mr. Reed provided testimony, about the events surrounding the loan documents. Hr'g Tr. 10:12-39:23, Nov. 15, 2016. Special Agent Brian Pelfrey of the Internal Revenue Service ("IRS") testified that, in contrast

---

[4] Specifically, paragraph 14 of the PSR reads: "Planch admits in the Statement of Facts that the funds she took from The Border Station were taken without authorization. These admissions directly contradict the promissory notes and Consents in Writing that Planch presented to R.H. for signature. Because the defendant attempted to have R.H. sign documents that contained information contradictory to the facts contained in the Statement of Facts, her offense level was increased two-levels for attempting to obstruct justice pursuant to 3C1.1." Id. (emphasis added).

6

to Mr. Swartz and Mr. Reed's assertions, the Border Station's tax returns did not reflect the monies that the Petitioner had wired as loans. Id. 40:18-45:6.[5] The issue then arose that in order for the court to accept Mr. Swartz's proffer as testimony, he would need to become a witness at sentencing, and he would have to withdraw from representing the Petitioner. Id. 28:11-12. Mr. Swartz withdrew from the case, and, thus, sentencing was continued. Id. 50:10-51:23.

On February 3, 2017, the Petitioner came before the court for sentencing with new counsel, Lawrence H. Woodward, Jr. ECF No. 34. At this time, the Petitioner and the government had withdrawn their earlier objections to the obstruction of justice enhancement under U.S.S.G. § 3C1.1. PSR Add'l Addendum. The court then accepted a Plea Agreement Addendum and Supplemental Statement of Facts, both taken under oath. ECF Nos. 36, 37. The Supplemental Statement of Facts detailed the events that resulted in the Petitioner's obstruction of justice enhancement, noting that on April 10, 2016, after the Petitioner left R.H. under the impression that he did not sign the loan documents, the following occurred:

---

[5] Agent Pelfrey testified that the Border Station's tax returns only reflected approximately $20,000 of outstanding loans to shareholders by the end of 2012. Hr'g Tr. 42:8-12, Nov. 15, 2016. In contrast, the Petitioner's total transfer proceeds amounted to about $966,550 by the end of 2012. Id. 48:5-7; Statement of Facts ¶ 12.

Later that same day, C.H. met with R.H. and told R.H. that he would check with his attorney about whether or not they should sign them, but that, in the interim, R.H. should sign the documents. R.H. did so. C.H. later informed R.H. that the documents could not be used, that he would not sign them, and that he had ripped them up. Neither [the Petitioner]'s attorney nor [the Petitioner] knew that R.H. had signed the documents at C.H.'s request. Neither [the Petitioner]'s attorney nor [the Petitioner] presented executed documents to the government, but did provide unsigned copies at a later date at the government's request.

Suppl. Statement of Facts ¶ 25.

The court sentenced the Petitioner to a term of thirty-six (36) months imprisonment and three (3) years of supervised release. J. at 2-3, ECF No. 39. The Petitioner did not appeal.

## II. LEGAL STANDARD

A petitioner may challenge a sentence imposed by a federal court if: (1) the sentence violates the Constitution or laws of the United States; (2) the sentencing court lacked jurisdiction to impose the sentence; (3) the sentence exceeds the statutory maximum; or (4) the sentence "is otherwise subject to collateral attack." 28 U.S.C. § 2255(a). A sentence is "otherwise subject to collateral attack" if a petitioner shows that the proceedings suffered from "a fundamental defect which inherently results in a complete miscarriage of justice." United States v. Addonizio, 442 U.S. 178, 185 (1979) (quoting Hill v. United States, 368 U.S. 424, 428 (1962)).

The petitioner bears the burden of proving one of those grounds by a preponderance of the evidence. See Miller v. United States, 261 F.2d 546, 547 (4th Cir. 1958). If she satisfies that burden, the court may vacate, set aside, or correct the sentence. 28 U.S.C. § 2255(b). However, if the motion, when viewed against the record, shows that the petitioner is not entitled to relief, the court may summarily deny the motion. Raines v. United States, 423 F.2d 526, 529 (4th Cir. 1970).

### III. ANALYSIS

The Petitioner's Motion requests relief on two grounds: (1) lack of due process pursuant to Brady v. Maryland, 373 U.S. 83, 87 (1963), because the government failed to disclose exculpatory information prior to the Petitioner's guilty plea; and (2) ineffective assistance of counsel. Mot. at 1.

### A. Ground One: Brady Violation

Under Brady v. Maryland, the government "violates a defendant's right to due process if it withholds evidence that is favorable to the defense and material to the defendant's guilt or punishment." Smith v. Cain, 565 U.S. 73, 75 (2012) (citing Brady, 373 U.S. at 87). The Petitioner alleges that neither Mr. Swartz nor she were aware that the loan documents presented to R.H. were actually signed, and that the government knew of this information when it negotiated her guilty plea.

Mot. at 3. The Petitioner claims that if she had known this information, she "could have shown that the transfer was a loan and thus not reportable as income by her." Id. at 5. Therefore, the Petitioner argues that she did not have all of the relevant facts before her when she pleaded guilty, so her "plea was not made knowingly," and thus, should be invalidated. Id. at 7.

The government argues that the Petitioner's Brady claim should be denied, as it is procedurally barred and is without merit. U.S. Resp. at 5.

## 1. Procedural Default

The Petitioner's claim that the government committed a Brady violation is procedurally defaulted. "[T]he voluntariness and intelligence of a guilty plea can be attacked on collateral review only if first challenged on direct review." Bousley v. United States, 523 U.S. 614, 621 (1998). A procedurally defaulted claim may only be raised in a habeas petition, if the petitioner can demonstrate either actual innocence or cause and actual prejudice. Id. at 622.

First, the Petitioner cannot prove that she is actually innocent. "To establish actual innocence, petitioner must demonstrate that, 'in light of all the evidence,' 'it is more likely than not that no reasonable juror would have convicted h[er].'" Id. at 623 (quoting Schlup v. Delo, 513 U.S. 298,

327-28 (1995)). First, taking into account the Statement of Facts, its Supplement, and Agent Pelfrey's testimony at the hearing on November 15, 2016, the Petitioner cannot prove that no reasonable juror would have convicted her.[6] Further, the Petitioner stipulated, _after_ she learned that R.H. had actually signed the loan documents, that the transfer of monies "were without authorization and not pursuant to a loan." Suppl. Statement of Facts ¶ 24. She then proceeded to sentencing with the Supplemental Statement of Facts entered on the record under oath. _See_ Hr'g Tr. 11:3-12:8, Feb. 3, 2017, ECF No. 43.[7] Thus, as the government notes, "[b]y her own admissions, the loan documents were false evidence, such that they do not show that she was actually innocent." U.S. Resp. at 10.

The Petitioner also fails to put forward any evidence of cause and actual prejudice. The Petitioner does not address why she failed to challenge the alleged _Brady_ violation at either her sentencing on February 3, 2017,[8] or on direct appeal.

---

[6] _See_ _infra_ Section III.A.2 (discussing how the Petitioner cannot show that being unaware of R.H. signing the loan documents prejudiced her because other evidence confirms that the transferred funds were taken without authorization).

[7] There was never any motion to withdraw her guilty plea, no claim that it was involuntary, and no issue about it until this collateral motion was filed.

[8] Federal Rule of Criminal Procedure 11(d)(2)(B) allows a defendant to withdraw a guilty plea after the court has accepted

Therefore, because the Petitioner is neither actually innocent nor able to show cause and prejudice as to why she did not raise the _Brady_ violation earlier, her claim is procedurally defaulted.

## 2. **Brady** Violation

Even if the Petitioner could overcome the procedural default, her claim under _Brady_ fails on the merits. To make out a _Brady_ violation, the Petitioner must show that the undisclosed evidence is: (1) favorable to the Petitioner because it is exculpatory or impeaching; (2) material to the Petitioner's defense; and (3) the government had such information before and failed to disclose it. United States v. Wilson, 624 F.3d 640, 661 (4th Cir. 2010). "Evidence is 'exculpatory' and 'favorable' if it 'may make the difference between conviction and acquittal' had it been 'disclosed and used effectively.'" Id. (quoting United States v. Bagley, 473 U.S. 667, 676 (1985)). "[E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Bagley, 473 U.S. at 682.

The Petitioner argues that the information about the signed loan documents was exculpatory and favorable to her, because it

―――――――――――――――

it if she "can show a fair and just reason for requesting the withdrawal." See supra note 7.

12

would have allowed her to challenge the charge of tax evasion by showing that the transfer of monies constituted loans, and so not reportable as income by her. Mot. at 5. And, the Petitioner argues that the information was material to her defense because had she been aware of such information, she would not have pleaded guilty, thereby altering the result of her conviction. Id. at 6. Lastly, the Petitioner argues the government knew about the signed documents and did not disclose such information until the original sentencing hearing on November 15, 2016. Id. at 7.

Information that the loan documents were initially signed by R.H. at C.H.'s direction, and then subsequently ripped up by C.H. upon advice of counsel, is hardly exculpatory. Even if at some point C.H. intended to help the Petitioner by characterizing the transferred monies as loans, and telling R.H. to sign them in the interim, the intent changed once C.H.'s attorney advised him otherwise. Likewise, that R.H. signed the loan documents after he told the Petitioner he would not and she left thinking they were not signed, R.H. did not proceed any further once C.H. advised him that he had ripped them up. Suppl. Statement of Facts ¶ 25. The Petitioner then proceeded with sentencing after the Supplemental Statement of Facts was filed

under oath. See Hr'g Tr. 11:3-12:8, Feb. 3, 2017. The Petitioner thus knew all of this information when she was sentenced.

Importantly, any intent to sign the documents, or even the act of signing them, does not evidence that the transferred monies constituted a loan, but rather, evidences an intent to cover for the Petitioner. The Petitioner cannot show that the loan documents, which were admittedly fraudulent[9] and later torn up by C.H. and never given back to her by R.H., would have made a difference between conviction and acquittal for the Petitioner. See Wilson, 624 F.3d at 661. Accordingly, such information is not exculpatory.

Further, the Petitioner cannot prove the information was material, as there is no reasonable probability that, had she known of the supposedly withheld information, she would have chosen to plead not guilty.[10] First, C.H.'s Grand Jury testimony conflicted with the notion that the wired monies constituted a loan. See Hr'g Tr. 18:24-19:3, Nov. 15, 2016. And, once Mr. Swartz learned of C.H.'s Grand Jury testimony, he told C.H.'s attorney to throw away the loan documents because characterizing the transferred funds as a loan was no longer a

---

[9] The Petitioner stipulated that "the monies she had taken from the Border Station in 2010, 2011, and 2012 were without authorization and not pursuant to a loan." Suppl. Statement of Facts ¶ 24; see supra Section III.A.1.

[10] See supra notes 7, 8 and accompanying text.

14

viable defense. See id. 19:4-22:4. Second, Agent Pelfrey's testimony directly contradicted the notion that the wired monies constituted a loan. See id. 40:14-45:6.[11] Lastly, the Petitioner learned about the signed loan documents before she was sentenced. See Hr'g Tr. 22:19-21, Feb. 3, 2017 (Mr. Woodward telling the sentencing court how he discovered this information "through [his] investigation and by information provided to [him] by the Government"). The Supplemental Statement of Facts, which details information about R.H. signing the loan documents, was admitted before the Petitioner's sentencing. Id. 12:7-8.[12] At no point during the sentencing hearing on February 3, 2017, did the Petitioner request to withdraw her guilty plea.[13] Taking these facts into consideration, there is not a reasonable probability that prior knowledge of the loan documents being signed by R.H., and then ripped up by C.H., would have prompted the Petitioner to plead not guilty. See Bagley, 473 U.S. at 682. Accordingly, such information is not material.

Because the Petitioner cannot show that the information was exculpatory or material, she fails to demonstrate by a

---

[11] See supra note 5 and accompanying text.

[12] In point-of-fact, no signed loan documents existed to be discovered. The only documents the government had and produced were copies of the unsigned documents drafted at the request of Mr. Swartz by Mr. Reed for the Petitioner.

[13] See supra notes 7, 8 and accompanying text.

preponderance of the evidence that any alleged wrongdoing on the part of the government rose to the level of a <u>Brady</u> violation.[14]

### 3. Adequacy of Guilty Plea

Pursuant to <u>United States v. Fisher</u>, a court can vacate a guilty plea as involuntary, if the defendant shows that impermissible government conduct occurred, even if she is not factually innocent. 711 F.3d 460, 465-67 (4th Cir. 2013). If the defendant shows government misconduct, she then must demonstrate that there is a "reasonable probability" that, had the misconduct not occurred, she would not have pleaded guilty. <u>Id.</u> at 467.

Here, the Petitioner cannot show that had she known about the signed loan documents, she would not have pleaded guilty. To qualify as government misconduct under <u>Fisher</u>, it should be more than a defendant seeking to withdraw her plea simply because she regrets her decision, but instead should "strike[] at the integrity of the prosecution as a whole." <u>Id.</u> at 466. Any alleged withholding of information about R.H. signing the loan

---

[14] Because the court finds the information that R.H. signed the loan documents and C.H. later ripped them up is neither exculpatory nor material, it need not address whether the government had this information and wrongfully withheld it from the Petitioner. <u>See</u> <u>supra</u> note 12 and <u>infra</u> note 15.

documents, and C.H. subsequently ripping them up, does not rise to this level.[15]

Even assuming the Petitioner could prove that the government acted impermissibly, she cannot prove there is a reasonable probability that, had she known of the withheld information, she would have chosen to plead not guilty.[16] Accordingly, the Petitioner cannot show that she is entitled to have her guilty plea vacated under Fisher.

## B. Ground Two: Ineffective Assistance of Counsel

The Petitioner next alleges a Sixth Amendment violation, arguing that her sentencing counsel, Mr. Woodward, was ineffective pursuant to Strickland v. Washington, 466 U.S. 668 (1984). Mot. at 9.[17] To prevail on an ineffective assistance of

---

[15] The Petitioner asserts that the government knew that R.H. signed the loan documents before they were ripped up and failed to disclose this during plea negotiations. Mot. at 3. The government responds that the Petitioner had this information at her sentencing, and she went forward without objection. U.S. Resp. at 15; supra notes 7, 8 and accompanying text. Moreover, even assuming the government knew of the signed loan documents during plea negotiations, such information is neither exculpatory nor material; and thus any withholding of the information does not rise to the level of government misconduct under Brady. See supra Section III.A.2.

[16] See supra Section III.A.2. (explaining why the Petitioner cannot show the allegedly withheld information was material or prejudicial to her defense under Brady).

[17] The court notes that procedural default, which bars the Petitioner's Brady claim, see supra Section III.A.1, does not

17

counsel claim, the petitioner must show that: (1) her attorney's representation "fell below an objective standard of reasonableness"; and (2) due to counsel's unprofessional errors, the defendant was prejudiced. See Strickland, 466 U.S. at 687-88. The Petitioner alleges that her counsel was ineffective because he failed to make various objections to the PSR, which led to a higher sentence. Mot. at 12-15.[18] For the reasons set forth below, the court finds no merit to Ground Two.[19]

### 1. Tax Rate Used to Calculate Tax Loss

First, the Petitioner argues that her counsel should have objected to the tax rate used to calculate the loss amount under U.S.S.G. §§ 2T1.1, 2T4.1, which established the Petitioner's

---

apply to a claim of ineffective assistance of counsel. See Murray v. Carrier, 477 U.S. 478, 488 (1986).

[18] The PSR assigned the Petitioner a Base Offense Level of sixteen (16), pursuant to U.S.S.G. §§ 2T1.1(a)(1) and 2T4.1(F), along with a two-level enhancement under U.S.S.G. § 2T1.1(b)(1) for failing to report income derived from criminal activity in excess of $10,000; a two-level enhancement under U.S.S.G. § 3B1.3 for abuse of position of trust; a two-level enhancement under U.S.S.G. § 3C1.1 for obstruction of justice; and a three-level reduction for acceptance of responsibility under U.S.S.G. § 3E1.1, for a total offense level of nineteen (19). PSR ¶¶ 17, 18, 20, 21, 24-26.

[19] Aside from the reasoning set forth infra Sections III.B.1, III.B.2, and III.B.3, objecting to the sentencing enhancements may have risked losing the three-level reduction for acceptance of responsibility, which the court granted, despite the obstruction of justice enhancement. See supra note 18; Hr'g Tr. 27:15-19, Feb. 3, 2017.

base offense level of sixteen (16). Mot. at 12; PSR ¶ 17. The Petitioner states that her tax loss was calculated by applying a tax rate of twenty-eight percent (28%) to her unreported income. Mot. at 12. The Sentencing Guidelines specify that for tax evasion cases in which a defendant underreports gross income, "the tax loss shall be treated as equal to 28% of the unreported gross income . . . unless a more accurate determination of the tax loss can be made." U.S.S.G. § 2T1.1(c)(1)(A). The Petitioner argues that "[t]he more accurate determination of tax loss to the United States would have been to apply [her] actual tax rate, as calculated on her filed tax return," which was below twenty percent (20%). Mot. at 12. And, Mr. Woodward's failure to object to this calculation was unreasonable. Id. at 13.

However, the Petitioner is mistaken. The PSR did not use a twenty-eight percent (28%) tax rate to determine the Petitioner's total tax loss. Rather, the Petitioner's tax loss was calculated using a more accurate determination: between approximately twenty percent (20%) and twenty-five percent (25%), which is what her actual tax rate would have been had the Petitioner reported all income to the IRS, including the large transfers from the Border Station's account.[20] Therefore, because

---

[20] The Petitioner's tax rate changed based on her income for each year. Also, in determining the correct tax rate, the PSR did not take into account any deductions to which the Petitioner

19

the Petitioner's tax loss was determined using a "more accurate determination" than twenty-eight percent (28%), and in fact more favorable to her, objecting to the tax rate used would have been meritless and, therefore, unreasonable.

## 2. Failing to Report Income from Criminal Activity Enhancement

Second, the Petitioner argues that counsel should have objected to the enhancement for failing to report income derived from criminal activity under U.S.S.G. § 2T1.1(b)(1). Mot. at 13; PSR ¶ 18. This two-level enhancement applies only if the unreported income exceeds $10,000 and is derived from criminal activity. See U.S.S.G. § 2T1.1(b)(1). The Petitioner argues that her only "criminal activity" was underreporting income, not embezzlement, and, therefore, the enhancement should not apply. Mot. at 13. She thus argues by not objecting to this enhancement, Mr. Woodward's conduct was unreasonable. Id.

Although the Petitioner was never charged with embezzlement, "a sentencing court may consider uncharged and acquitted conduct in determining a sentence, as long as that conduct is proven by a preponderance of the evidence." United States v. Grubbs, 585 F.3d 793, 799 (4th Cir. 2009) (citing

---

may have been entitled. See United States v. Delfino, 510 F.3d 468, 473 (4th Cir. 2007) (holding that defendants "forfeit[] the opportunity to claim . . . deductions" when they "cho[ose] not to cooperate with the . . . IRS").

*United States v. Watts*, 519 U.S. 148, 157 (1997), and *United
States v. Jones*, 31 F.3d 1304, 1316 (4th Cir. 1994)). Therefore,
the § 2T1.1(b)(1) enhancement applies as long as the court finds
by a preponderance of the evidence that the Petitioner's
unreported income was derived from embezzlement.

In the Supplemental Statement of Facts, to which the
Petitioner entered under oath, the Petitioner stipulated that
the monies taken from the Border Station's account "were without
authorization."[21] This statement, along with other information in
the Statement of Facts, its Supplement, and Agent Pelfrey's
testimony,[22] provide more than a preponderance of the evidence
that the wired funds were a result of embezzlement. In turn, it
was reasonable for the Petitioner's counsel to withhold
objecting to this enhancement.

### 3. Abuse of Position of Trust Enhancement

Lastly, the Petitioner argues that counsel should have
objected to the two-level enhancement for abuse of a position of
trust under U.S.S.G. § 3B1.3. Mot. at 14; PSR ¶ 20. The
Petitioner argues that in order for the § 3B1.3 enhancement to
apply, her position of trust "must have contributed in some
significant way to facilitating the commission or concealment of

---

[21] See *supra* note 9.

[22] See *supra* notes 5, 11 and accompanying text.

the offense." Mot. at 14 (quoting U.S.S.G. § 3B1.3 cmt. n.1).
Because her offense was the underreporting of income, the
Petitioner argues the court should not take into account any
alleged embezzlement in determining whether this enhancement
applies. Id. Thus, she maintains that Mr. Woodward was
unreasonable in not objecting to this enhancement. Id.

Again, in sentencing a defendant, the court can take into
account "uncharged and acquitted conduct," if proven by a
preponderance of the evidence. Grubbs, 585 F.3d at 799.
Therefore, even though the Petitioner was convicted of failing
to report income on tax returns, the court can take into account
the embezzlement described in the Statement of Facts and its
Supplement when applying the abuse of trust enhancement in
relation to her positions at the Border Station and the
Christmas Shoppe. The preponderance of the evidence shows that
the income the Petitioner underreported was a direct result of
embezzlement.[23] After all, the income that the Petitioner failed
to report to the IRS is the monies transferred without
authorization.

"[T]he central purpose of § 3B1.3 is to 'penalize []
defendants who take advantage of a position that provides them
with the freedom to commit a difficult-to-detect wrong.'" United

_____

[23] See supra Section III.B.2 and note 9.

22

States v. Brack, 651 F.3d 388, 393 (4th Cir. 2011) (quoting United States v. Bollin, 264 F.3d 391, 415 (4th Cir. 2001)). Here, the Petitioner was the bookkeeper for the Border Station and had full access to the company's accounts.[24] "Based on [the Petitioner's] position of trust, the outside bookkeeper believed her when she was confronted about the unauthorized taking of funds which permitted her to continue to take funds from The Border Station account." PSR ¶ 13. Based on such facts, the court finds there to be a preponderance of the evidence showing that the Petitioner was in a position of trust that significantly contributed to her ability to take the funds without authorization; and, the funds taken constituted the income that the Petitioner failed to report on her tax returns. In turn, it was reasonable for Mr. Woodward to withhold objecting to the § 3B1.3 enhancement.

## IV. CONCLUSION

For the reasons stated herein, the Petitioner's Motion is **DENIED** in its entirety. The Petitioner is **ADVISED** that she may appeal from this Memorandum Opinion and Final Order by

---

[24] "In her capacity as the bookkeeper, [the Petitioner] was responsible for payroll, paying bills, making deposits, transferring funds between the Border Station's various operating accounts, and communicating with the Border Station's external accountant for the preparation of the corporation's tax returns." Statement of Facts ¶ 3. The Petitioner also had signatory authority for the Border Station's bank accounts. Id.

23

forwarding a written notice of appeal to the Clerk of the United States District Court, United States Courthouse, 600 Granby Street, Norfolk, Virginia 23510. Said written notice must be received by the Clerk within sixty (60) days of the date of this Memorandum Opinion and Final Order. For the reasons stated herein, the court declines to issue a certificate of appealability.

The Clerk is **DIRECTED** to send a copy of this Memorandum Opinion and Final Order to the Petitioner, to Lawrence H. Woodward, Jr., and to the United States Attorney at Norfolk.

**IT IS SO ORDERED.**

/s/
Rebecca Beach Smith
Chief Judge

REBECCA BEACH SMITH
CHIEF JUDGE

August 3 , 2018